Daniel Alvin JACOBSON, Appellant,

v.

ILLINOIS FARMERS INSURANCE
COMPANY, Respondent.

No. 47595.

Supreme Court of Minnesota.

March 10, 1978.

Chadwick, Johnson & Bridell, Richard J. Chadwick and Mark J. Condon, Minneapolis, for appellant.

Rider, Bennett, Egan, Johnson & Arundel and David F. Fitzgerald and William J. George, Minneapolis, for respondent.

Heard before KELLY, TODD, and IRVINE, JJ., and considered and decided by the court en banc.

TODD, Justice.

Daniel Jacobson was seriously injured in a collision with another vehicle while operating his motorcycle. At the time of the accident, Jacobson carried insurance coverage on the motorcycle with Dairyland Insurance Company and coverage on two family automobiles with Illinois Farmers Insurance Company. The other party involved in the accident had minimum liability coverage of $10,000. Jacobson's claim for damages exceeded that minimum liability coverage, and he brought a declaratory judgment action alleging that by virtue of the failure of Illinois Farmers to make

underinsured motorist coverage available, he was entitled to recover under such coverage as a matter of law. The trial court denied relief. We affirm.

On July 18, 1974, Jacobson was injured while operating his motorcycle. As a result of the accident, Jacobson's left leg was amputated below the knee and he now wears an artificial leg. The accident appears to have been caused by the driver of the automobile with which he collided. The driver at fault carried liability insurance in the minimum amount of $10,000 for a single injury, and the insurance on the Jacobson motorcycle was subject to the same limit.

■ At the time of the accident, Jacobson also owned two automobiles which were insured by Illinois Farmers Insurance Company. These policies carried limits of $50,000 per accident and were undisputedly in force when the accident occurred. Although the policies contained *un*insured motorist coverage as required at that time, there was no inclusion of *under*insured motorist coverage.[1]

A 1971 amendment to the Minnesota insurance statutes provided that effective January 1; 1972, all automobile insurers doing business in Minnesota would be required to make available to their customers underinsured motorist coverage. To satisfy the requirements of the new law, Illinois Farmers prepared a mailing insert or "stuffer" which explained the availability and operation of the new coverage. This information was enclosed on a one-time basis with regular premium notices mailed out to policyholders after June 1, 1972.

At trial, Jacobson and his wife testified to having no recollection of receiving any such stuffer as part of their semiannual premium notice. The Jacobsons conducted their insurance business primarily over the telephone with Lloyd Broberg, a local agent of Illinois Farmers. It appears that Broberg spoke to the Jacobsons several times after the enactment of the underinsured motorist legislation. Broberg testified that he specifically informed Mrs. Jacobson of the availability of the new coverage during the course of a conversation with her concerning the purchase of liability coverage on a new car. Mrs. Jacobson was unable to recall the specifics of this conversation.

Jacobson instituted this action for a declaratory judgment, seeking a ruling that Illinois Farmers was obligated to provide him with underinsured motorist coverage and failed to do so. The trial court found that Illinois Farmers had made underinsured coverage available in conformance with the statute and that Jacobson had not purchased it. On appeal, Jacobson challenges both the legal and factual aspects of this finding.[2]

Jacobson contends that Illinois Farmers violated Minn.St.1971, § 65B.25 by failing to have "made available" underinsured motorist coverage as required by the statute. The narrow issue for resolution by this court is whether the actions taken by Illinois Farmers to comply with the statute were sufficient to have made the subject coverage available within the terms of the statute.

Prior to 1972, optional underinsured motorist coverage was not offered in Minnesota. In May 1971, however, Senate File No. 376 was enacted which added underinsured motorist coverage to the existing list of supplemental coverages which were required to be "made available" to the purchasers of automobile liability insurance. The resulting statutory scheme was as follows:

---

1. Underinsured motorist coverage becomes operative when a policyholder, involved in an accident with another vehicle, is legally entitled to recover damages which exceed the limits of the liability coverage carried by the driver of the other vehicle.

2. A second issue is raised as to whether Jacobson would be covered by his automobile policy while riding a motorcycle. The trial court found it unnecessary to rule on this issue and we agree.

65B.25. "No automobile liability or motor vehicle liability policy of insurance shall be renewed, issued, or delivered in this state with respect to any automobile registered or principally garaged in this state unless coverages are made available to the named insured therein or supplemental thereto as set forth in section 65B.26, provided, however, that the named insured shall have the right to accept in writing all or any one or more of such coverages."

65B.26. "Such supplemental insurance coverages shall as a minimum include:

\* \* \* \* \* \*

"(d) Beginning January 1, 1972, under-insured motorist coverage, whereby subject to the terms and conditions of such coverage the insurance company agrees to pay its own insured for such uncompensated damages as he may recover on account of an automobile accident because the judgment recovered against the owner of the other vehicle exceeds the policy limits thereon, to the extent of the policy limits on the vehicle of the party recovering or such smaller limits as he may select less the amount paid by the liability insurer of the party recovered against. His insurance company shall be subrogated to any amounts it so pays, and upon payment shall have an assignment of the judgment against the other party to the extent of the money it pays." [3]

Thus, effective January 1, 1972, all insurers were required to make available as an option the underinsured motorist coverage described in § 65B.26(d) above.

At trial, Illinois Farmers introduced testimony which described in detail the mechanized mailing process utilized to inform Illinois Farmers' policyholders of the availability of the new coverage. Opposed to this evidence was the testimony of Mr. and Mrs. Jacobson, who stated that in spite of Illinois Farmers' notification procedure, they had not received any information or solicitation concerning the new coverage. Having heard both parties' testimony, the trial court specifically found:

"8. That plaintiff either elected not to take out such coverage or otherwise overlooked the stuffer application (form 25–0970), but in either event did not request in writing the under-insured motorist coverage offered at such time."

While not conceding the correctness of this finding, Jacobson argues that even if he did receive notice of the newly offered coverage, such coverage must be deemed in effect as to him until he rejects the same in writing. This contention is grounded on the decisions of this court construing the statutory provisions which govern *uninsured* motorist coverage.[4] A brief review of the relatively short history of *uninsured* motorist coverage is thus in order.

Uninsured motorist coverage was first enacted by the Minnesota Legislature in 1967. Minn.St.1967, § 72A.149, subd. 1, provided in part:

"No automobile liability or motor vehicle liability policy of insurance \* \* \* shall be delivered or issued for delivery in this state \* \* \* unless coverage is provided therein or supplemental thereto, under provisions approved by the commissioner of insurance, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles \* \* \* provided, that the named insured shall have the right to reject in writing such coverage; \* \* \* ."

Under the plain language of the statute, insurance carriers were required to include

---

**3.** This provision presently appears in similar language as part of Minnesota's no-fault statute, Minn.St. 65B.49, subd. 6(e).

**4.** Resort to decisions construing the *uninsured* motorist statute is necessary because this court has decided only one case involving the newer *under*insured motorist provision. See, *Lick v. Dairyland Ins. Co.* Minn., 258 N.W.2d 791 (1977). That opinion did not address itself to the issue under consideration in this case.

uninsured motorist coverage in their automobile policies *unless such coverage was expressly rejected* in writing by the named insured.

The legislature's regard for the importance of uninsured motorist coverage apparently continued to grow, resulting in a 1969 amendment to § 72A.149 which eliminated policyholders' power to reject uninsured motorist coverage. Beginning on January 1, 1970, all automobile insurance policies were thus required to contain coverage for injuries caused by uninsured drivers whether the named insured desired such coverage or not. In *Folstad v. Farmers Insurance Exchange,* 297 Minn. 496, 498, 210 N.W.2d 238, 240 (1973), this court took notice of the "important policy considerations" underlying the mandatory uninsured motorist coverage. The court relied on those considerations as the basis for a strict construction of the pre-1970 written rejection clause of § 72A.149.

Jacobson argues that equally weighty considerations led to the enactment of the underinsured motorist provision in Minn.St. 1971, § 65B.26(d). He suggests that *under*insured coverage is in essence a statutory twin to *un*insured motorist coverage. As a result, Jacobson argues, *under*insured motorist coverage must be deemed in effect as to him until such time as he specifically rejects it in writing.

■ Although uninsured and underinsured motorist coverages are directed toward the same general problem, the manner in which the legislature has treated each type of coverage seriously undercuts the characterization Jacobson seeks to establish. Of critical importance is the legislative placement of the opt-in/opt-out burden for each of the two types of coverage. As previously described, Minn.St.1969, § 72A.149, made *un*insured motorist coverage automatic unless a policyholder opted out and rejected it. Minn.St.1971, § 65B.25, reverses this burden for *under*insured motorist coverage. Again, the statute provides:

"[Underinsured motorist coverage shall be] made available * * * provided, however, that the named insured shall have the right to accept in writing * * ."

Thus, unless a policyholder takes affirmative action to opt in and accept the newly offered coverage, he will not receive it.

■ Section 65B.25 is notably unambiguous. The plain meaning of the quoted language requires only that insurers offer, as part of their available coverage, protection against underinsured drivers. The manner in which the original bill was amended in committee lends additional support to this construction. As initially drafted, the supplemental coverage provision (House File No. 1874), to which the *under*insured motorist provision was added in 1971, was to apply in the same manner as the existing uninsured motorist statute. That is, insurers would have been required to include *under*insured motorist coverage in every automobile policy unless such coverage was rejected in writing by the policyholder. However, the committee on insurance amended the language to read as it now appears. See, Journal of the House, 1969, pp. 1593–1594. It is difficult to assume that the committee's abandonment of familiar terms in favor of other language was purely coincidental, especially where the new language seems clearly to reflect a shift in legislative emphasis. Accordingly, we reject Jacobson's contention and hold that an insured need not be afforded underinsured motorist coverage by his insurer unless such coverage has been accepted in writing.

■ There remains, however, the question of whether the steps taken by Illinois Farmers in this case sufficiently "made available" the underinsured motorist coverage within the contemplation of § 65B.25. The procedure adopted by Illinois Farmers to comply with the statute was relatively simple. All of Illinois Farmers' policyholders were required to make semi-annual premium payments. Premium notices were

mailed from Illinois Farmers' home office to each policyholder once every 6 months. To provide notice of the new coverage, the company inserted a "stuffer" into each premium notice which explained the underinsured motorist coverage and included an application form. This stuffing procedure was accomplished with a machine customarily used by the company to insert all of its mass mailing material, including premium notices, into individual envelopes for postal delivery. The stuffing machine was equipped with a device which automatically detected envelopes containing fewer than the desired number of documents.

We conclude that Illinois Farmers' notification process was commercially reasonable. The explanatory materials concerning the newly available coverage were sent out with important premium notices rather than as a separate, more obscure mailing. The procedure thus seems clearly designed to make the new coverage adequately visible. Also, the stuffing device, while undoubtedly not foolproof, was obviously considered trustworthy by the company, since it was routinely used for premium mailings. In short, the procedure employed was not deficient in any material respect.

Having disposed of the appeal on the grounds stated above, we need not consider the other issues which the parties raise in their briefs.

Affirmed.

SHERAN, C. J., took no part in the consideration or decision of this case.